UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARTHUR L. BURGESS,

          Petitioner,

                                      Case No. 07-11367

v.                                     Honorable David M. Lawson

THOMAS K. BELL,

          Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

The petitioner, Arthur L. Burgess, was convicted of murdering three people in 1974. The crimes had gone unsolved for three years, but in 1977 two individuals involved in unrelated criminal prosecutions came forward with information that Burgess had admitted to them that he committed the 1974 killings. Burgess was then charged and brought to trial in the Wayne County, Michigan circuit court. His jury convictions were affirmed by the state appellate courts and a 1981 petition for habeas corpus was dismissed by this Court without prejudice for failure to exhaust all the stated claims at the time. In 2003, Burgess filed a post-conviction motion for relief from judgment in the state trial court, arguing that he recently discovered potentially exculpatory evidence that the prosecutor had not disclosed to him before trial, the trial court committed certain evidentiary errors, and his trial and appellate lawyers were constitutionally ineffective. A different state court judge held hearings on the motion, since the original trial judge had retired. The hearings consisted of arguments by counsel and the presentation of documents from the record and affidavits; no testimony was taken. On December 2, 2005, the state court announced its decision denying the motion, finding that the petitioner either had actual knowledge of the information he contended was suppressed or he could have readily obtained it. In 2007, Burgess filed through counsel the present

petition for writ of habeas corpus, which focuses primarily on the argument that critical evidence material to the petitioner's guilt was suppressed by the state. He renews his ineffective assistance of counsel arguments as well.

The Court concludes that the there is abundant support in the record for the state court's conclusion that the evidence the petitioner contends was suppressed actually was known — and sometimes used at trial — by his trial counsel. The Court also finds that the petitioner has not satisfied both the deficient performance and prejudice components of the applicable test for ineffective assistance of counsel. There were no violations of the Sixth Amendment or Due Process Clause, and the petitioner in not entitled to a writ of habeas corpus. His petition, therefore, will be denied.

## I.

The record in this case is not complete. Several pages are missing from the trial transcripts and only small fragments exist for many of the trial-day volumes. Both sides filed briefs in the state court of appeals on direct appeal, which contain detailed factual summaries, and it appears that there is no dispute over the contents of the trial record or the core facts of the case. The Court's factual summary is drawn from the transcripts, the direct appeal documents, and the petitioner's brief filed in this Court. The respondent did not file a timely response.

### A.

The murder victims — Leslie Kinsman, Victor Bossio, and James Ketelaar — were killed on April 14, 1974 at an apartment in Dearborn, Michigan. The apartment was occupied by Leslie Kinsman, his wife Mary, and their three-month-old son. Mary testified at trial that she had been married to Leslie for nine months and knew that he made his living by selling illegal drugs from

their home.  James Ketelaar was Leslie's body guard, and Victor Bossio was their landlord who lived in the basement apartment.

Mary testified at trial that she was home on April 12, 1974 when a friend named Roman Poronczuk came over to visit at about 9:00 p.m.  He asked if he could take a shower.  Roman was in the bathroom, and James Ketelaar and Leslie were elsewhere in the house when Mary heard someone enter the side door to the house, which led jointly to both the Kinsmans' upstairs and Bossio's basement residences.  A few minutes later, Bossio came up the stairs, knocked on the kitchen door, and stated that he wanted to see Leslie in the basement.  Leslie Kinsman went to the basement alone.

Shortly thereafter, Mary, while in the bedroom with her baby, heard three shots from the basement.  She started for the kitchen with Ketelaar ahead of her.  She heard someone running up the stairs.  Ketelaar stepped into the open door and shouted "what the hell is going on."  Mary then heard another shot and saw Ketelaar fall backwards.  Mary heard the outer door slam and a car start and speed away.

Mary yelled downstairs for Leslie with no response.  Finally, she walked down the stairs, and as she stepped into Victor Bossio's apartment she saw Bossio lying on the floor with his face covered with blood.  She ran up the stairs and called Oakwood Hospital.  She was told to call the police.  Mary testified that she got Roman Poronczuk out of the shower.  Both were in shock and confused.   After some delay, they called some friends who called the police.  The police arrived within minutes.

When the Dearborn police officers arrived at the crime scene around 10:30 p.m., they discovered the bodies of Leslie Kinsman and Victor Bossio in the basement, and the body of Jim

Ketelaar in the dining room. The Dearborn officers preserved the scene for State Police Crime Lab experts. In their cursory review of the crime scene, they observed that Roman Poronczuk had wet hair and the shower appeared to have been recently used. Poronczuk testified that he was in the shower when the shooting occurred. He admitted that he took some heroin when he arrived at the house. He said that he knew Leslie Kinsman was involved in drug trafficking.

The Michigan State Police technician was able to determine that the trajectory of the single bullet fired upstairs passed through Ketelaar, which was consistent with Mary Kinsman's description of the events. The technician also testified that the blood stains found in the basement, the stairs leading from the basement, and the outside door knob were consistent with the blood types of Victor Bossio and Leslie Kinsman. The state police technical witness testified that bullet fragments found at the scene were consistent with having been fired from a .38 caliber pistol. The latent fingerprint expert testified that no fingerprints matching the petitioner's were found at the scene.

Mary Kinsman testified that she first met petitioner Burgess in February 1972 in New Orleans. She stayed with him and his wife for five months before the trio moved to Las Vegas. During that same period of time and continuing for several months, Mary testified, she had sexual relations with the petitioner, who was going to leave his wife for Mary.

In the fall of 1972, Mary met Leslie Kinsman and ended her affair with the petitioner. The next time she had contact with him was at the funeral home after Leslie Kinsman was killed. She next saw the petitioner at a restaurant in Ohio in the fall of 1974. She was staying in Ohio with her parents when the petitioner called her. He said he was no longer with his wife and wanted Mary to return to Detroit with him. Mary said the petitioner refused to allow her to mention Leslie's name during their conversation.

The two witnesses who implicated the petitioner in the murders were Scott Allan Croydon and Claude Johnson. Croydon refused to testify, so the trial court allowed his preliminary examination testimony to be read to the jury. He said that he had first met the petitioner around March 25, 1976. He stated that on several occasions, the petitioner told him that Claude Johnson knew too much information about a triple murder that the petitioner had committed in Dearborn in 1974 and he had heard that Johnson was spreading that information. Croydon testified that petitioner Burgess told him one of the people he killed was named Kinsman, and he killed him because Kinsman was "messing around with his old lady and (had) crossed him on some deals – business deals, dope deals." Tr., Oct. 19, 1977, at 157; *see also* Tr. of Prelim. Exam. Hr'g, May 6, 1977, at 104. Burgess also told Croydon that he killed two other innocent people, one being the landlord. Croydon testified that "he had to take them out because they were witnesses." Tr., Oct. 19, 1977, at 158; *see also* Tr. of Prelim. Exam. Hr'g, May 6, 1977, at 104. According to Croydon, the petitioner explained that he had shot and stabbed the people, then left in a car and later asked Claude Johnson to pick him up at another location to get rid of the guns.

Croydon then testified about the petitioner's effort to eliminate Claude Johnson. He said that on April 12, 1976, Gerald Hessel (the petitioner's son) and he went to the petitioner's apartment in Roseville because the petitioner planned to go to Johnson's house to kill him. At the apartment, Hessel called Claude Johnson, telling him that he and Croydon wanted to come over to buy some marijuana from Johnson.

Croydon said the petitioner took a .45 caliber automatic pistol and gave Hessel and Croydon each a hunting knife, telling them that these were the knives he used during the Dearborn murders. The three drove to Johnson's house in two cars. The petitioner gave Hessel the pistol and waited

in one of the cars while Hessel and Croydon went to get Johnson.  Hessel, Johnson, and Croydon

went to Johnson's car, supposedly to purchase the marijuana.  When they got to the car, Hessel

pulled the gun and ordered Johnson to the petitioner's car, threatening to rob Johnson.  Johnson

protested, saying that he would give Hessel and Croydon anything but that they did not have to rob

him.

Croydon said that the petitioner then appeared behind the wheel of the other car.  Johnson

was ordered into that car.  Hessel then drove, with Johnson and the petitioner in the back seat.

Croydon was ordered to follow them in another car.  Croydon observed their car out of control; it

pulled off the road and Johnson jumped out.  The petitioner followed him with a gun in his hand.

Croydon saw the petitioner catch him, stand over him, and start firing his gun.

Hessel and Croydon picked up the petitioner some distance from Johnson's body.  The

petitioner hesitated, stating  "I got to turn back.  Go see – go back and see if he is alive."  Tr., Oct.

19, 1977, at 169; *see also* Tr. of Prelim. Exam. Hr'g, May 6, 1977, at 115.  By the time they returned

to the scene, people were near Johnson, so the three men left the scene.

Croydon testified that he had known Gerald Hessel for thirteen years, having grown up with

him.  Hessel introduced Croydon to the petitioner. Croydon stated that either Hessel or Brenda

Burgess, the petitioner's wife, were present during his conversation with the petitioner about

Johnson, during which the petitioner showed Croydon portions of Claude Johnson's prisoner file

and other documents that indicated Johnson had once cooperated with prison officials against

another prisoner. Croydon remembered that the petitioner said he used a .38 caliber pistol for the

Kinsman murders.

Croydon testified at the preliminary examination that he was not promised any inducement by the Wayne County Prosecutor or the Dearborn police for his testimony. He acknowledged that the Macomb County prosecutor agreed to reduce a murder charge against him to armed robbery in exchange for testimony in the case against petitioner Burgess for assaulting Johnson. Croydon said that he testified in Burgess's Wayne County murder case because it was the "right thing to do." Tr., Oct. 19, 1977, at 175; *see also* Tr. of Prelim. Exam. Hr'g, May 6, 1977, at 122.

Claude Johnson miraculously survived the petitioner's attempt on his life. He testified at the petitioner's trial that he had known the petitioner for 20 years as a friend. Johnson stated that a short time after the Kinsman murders, Johnson took the petitioner to Saratoga Hospital after Burgess was involved in a motorcycle accident. At the hospital, Burgess told Johnson that he had stabbed and shot Leslie Kinsman, and killed the landlord and a man named Ketelaar. The petitioner said he shot Ketelaar because he was looking down the stairs after the petitioner killed Kinsman and the landlord. The petitioner explained that he initially went to the landlord's apartment in the basement and persuaded him to call Kinsman down. Johnson stated that the conversation was private, even though Mrs. Burgess went with them to the hospital.

In describing the events of April 12, 1976, Johnson testified that after he was forced into the car with the petitioner and Hessel, the petitioner questioned Johnson about being an informant, money he owed him, and a letter from the state police from his prison file. The petitioner accused Johnson of being an informant and stated, "This ain't for nothing you've done. It's for what you could do." Tr., Oct. 20, 1977, at 18. Johnson testified that he tried to escape as the car turned down a dead end street. Before he could leap from the car, however, the petitioner and Hessel both stabbed him repeatedly.

Johnson was able to exit the car and ran approximately 50 feet, but he stopped because he was bleeding profusely. He said the petitioner walked up to him, asked him if he wanted to go to the hospital, and then shot him repeatedly. The petitioner was prosecuted in a Macomb County court for the assault on Johnson.

Johnson also testified that the petitioner had stated on several occasions that he did not like Leslie Kinsman. Their rivalry stemmed from the fact that Kinsman married Burgess's girlfriend.

Roseville police officer Richard Heinz testified that he arrested Croydon, Hessel and Burgess on April 12, 1976, and subsequently found two hunting knives in their cars, which were introduced into evidence.

The defense called four witnesses: Brenda Burgess, Gerald Hessel, Ronnie Bankston, and William Cleary. Brenda Burgess testified that she had been married to the petitioner for seven years, during which they had separated on several occasions. During one of their separations, the petitioner lived with Mary Kinsman. Mrs. Burgess acknowledged that she saw a letter from the corrections department in July 1973 concerning Claude Johnson's cooperation with authorities. She said that her husband kept it in his jewelry box. She also testified that her husband had several knives and used them to clean fish. He got the knives from their friend Bill Cleary.

Brenda Burgess insisted that Claude Johnson never had the opportunity to carry on a private conversation with the petitioner at Saratoga Hospital on the day of the motorcycle accident because she was with him at all times and the petitioner was in too much pain to talk. She said she kept clippings of the Kinsman murders at their home, and at one time showed them to Scott Croydon. Mrs. Burgess stated that when she and the petitioner went to see a concert with Gerald Hessel and Scott Croydon, that the petitioner was always with her.

Gerald Hessell testified that he and Scott Croyden visited the petitioner together regularly in March and April of 1976. He said that he knew Scott Croydon had been arrested and sent to a youth home on several occasions and had been convicted of attempted breaking and entering. Hessel testified that the Dearborn murders were never discussed when he was at the petitioner's house with Croyden. But once when the petitioner was not present, Brenda Burgess gave Croyden a newspaper clipping about the Dearborn murders.

Hessel testified that after he, the petitioner, and Croydon were arrested in April 1976 for the assault of Johnson, Croyden brought up the Dearborn murders while they were in jail together. Hessel said the petitioner once told him never to trust Johnson because he was an informant, and he showed him documents to verify that accusation.

Hessel also testified that on April 12, 1976, he, Croydon, and the petitioner went to rob Johnson because he owed the petitioner money; the Dearborn murders were never discussed. He stated that the petitioner never said he used the hunting knives in the Dearborn murders. Hessel did acknowledge that the petitioner told him after they were arrested and were with Croyden in the "bullpen" at the Macomb County jail that he believed Claude Johnson was trying to pin the Dearborn murders on him.

Hessel admitted that at one time he decided to try to testify against the petitioner about the Dearborn murders in order to "extricate" himself from the Macomb County charges, so he made statements to certain Dearborn police officers implicating the petitioner. Hessel said he told Croydon about his intentions, and Croydon said they should both do that. Hessel said he and Croydon discussed this secretively since they did not want it "getting back to [the petitioner]." State's Br. on Direct Appeal to Mich. Ct. App., at 15.

Ronnie Bankston testified for the defense that in 1973 the petitioner showed him a letter that indicated that Johnson was a State Police informant. Bankston said Burgess told him that if he did not "want any of my business known, don't say nothing around [Johnson]." *Ibid.*

William Cleary testified the petitioner gave him a job as head maintenance man at a co-op Apartment complex, where he once found two hunting knives and gave them to the petitioner. He identified the knives confiscated from the petitioner at his arrest as those knives. He said he gave them to the petitioner in the summer of 1974, before the murders. Cleary also said that the petitioner showed him a letter that related to Johnson in late 1973.

The jury found the petitioner guilty of murder in the first-degree in the murder of Leslie Kinsman and guilty of second-degree murder of the other two victims. He was sentenced to three terms of life in prison.

B.

On direct appeal, the Michigan Court of Appeals affirmed the petitioner's convictions in a published opinion. *People v. Burgess*, 96 Mich. App. 390, 292 N.W.2d 209 (1980). The state supreme court denied leave to appeal. *People v. Burgess,* No. 64971, slip op., at 1 (Mich. Sept. 1, 1980).

In 1981, the petitioner filed a petition for writ of habeas corpus that raised the same claims asserted on direct appeal plus a new claim of ineffective assistance of appellate counsel. The petitioner also changed the legal basis for one other ground. The petition was denied without prejudice for failure to exhaust state court remedies. *Burgess v. Mintzes*, No. 81-74716, slip op. (E.D. Mich. July 9, 1982).

On May 16, 2003, the petitioner filed a motion for relief from judgment in the state trial court raising five issues: (1) the prosecutor failed to timely disclose critical exculpatory evidence; (2) the trial court's exclusion of evidence implicating other suspects violated the petitioner's due process right to present a defense; (3) a key prosecution witness improperly bolstered his own credibility by referring to the fact that he took a lie detector test; (4) the petitioner was denied the effective assistance of trial counsel; and (5) the petitioner was denied the effective assistance of appellate counsel. The trial court held three hearings on the motion on January 21, September 30, and December 2, 2005, announcing its decision to deny the motion on the last of these dates as follows:

> I find that the defendant had actual knowledge and/or possession of the material in question or he could have obtained it if [he] didn't. But I think that he did based on the testimony at the trial, et cetera. With reasonable diligence, he could have obtained it.
> I [find] that the defendant did not provide any independent evidence persuasive to the court. I [find] a position was advocated or put forth by him and his wife, under the Freedom of Information Act, et cetera. I [find] no supporting affidavits, no evidence, that persuaded me that he met his burden and that there was a Brady violation.

Tr. of Mot. Hr'g, Dec. 2, 2005, at 57-58. The court also found that the petitioner did not establish that his trial counsel or his appellate counsel were constitutionally ineffective.

The state appellate courts denied leave to appeal "for failure to meet the burden of establishing entitlement to relief under M.C.R. 6.508(D)." *People v. Burgess*, No. 26823 (Mich. Ct. App. Aug. 16, 2006); *People v. Burgess*, No. 132187 (Mich. Mar. 26, 2007).

## C.

The present petition for writ of habeas corpus raises the following grounds:

I.    Whether Petitioner Burgess was denied his right to a fair trial under the Due Process Clause of the United States Constitution (14th Amendment) where the prosecutor failed to timely disclose critical Brady material.

-11-

II.     Whether Petitioner was denied the effective assistance of counsel guaranteed by the federal and state constitutions (U.S. Const. Am. VI) where his trial attorney, with no strategic purpose, made several outcome-determinative errors.

III.    Whether Petitioner was denied the effective assistance of counsel guaranteed by the federal constitution (U.S. Const. Am. VI) where his appellate counsel, on direct appeal, neglected "dead bang winners."

IV.     Assuming arguendo that the standard of review set forth in 28 U.S.C. § 2254(d)(1) precludes relief in this action, whether the court should not apply that standard because it is unconstitutional, and the court should grant the writ under a de novo standard of review.

Pet. at iv.  The petition challenges the validity of the convictions for the Dearborn murders.  The petitioner also is presently serving three additional life sentences for a 1977 Macomb County conviction of first-degree murder, assault with intent to commit murder, and armed robbery.  He is serving yet another life sentence for a 1977 Wayne County of assault with intent to commit murder.  These additional convictions and sentences are not challenged in the present case.

## D.

The respondent failed to file a timely answer to the petition.  Although the respondent's failure to file an answer in this case betrays a concomitant failure to appreciate the gravity of the issues raised in this case and demonstrates a lack of respect for the Court, that breach does not entitle the petitioner to habeas relief because to do so would amount to granting a default judgment to the petitioner, which is a form of relief unavailable in habeas proceedings.  *See Allen v. Perini*, 424 F.2d 134, 138 (6th Cir. 1970) ("Default judgments in habeas corpus proceedings are not available as a procedure to empty State prisons without evidentiary hearings.").

The petition challenges a conviction that is nearly thirty years old and raises some issues that could have been advanced years ago.  However, the Court previously ruled in this case that the

respondent has waived the right to raise any procedural defenses to the petition, including the statute of limitations and procedural default. *See Burgess v. Bell*, 555 F. Supp. 2d 855, 858 (E.D. Mich. 2008). Therefore, the Court will turn to the merits of the petitioner's claims.

II.

The petitioner's convictions occurred well before the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). However, the AEDPA applies to all habeas petitions filed after the effective date of the Act, *Lindh v. Murphy*, 521 U.S. 320, 336 (1997), and because the present petition was filed in 2007, the AEDPA applies here. The AEDPA "circumscribe[d]" the standard of review federal courts must apply when considering applications for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

As amended by the AEDPA, 28 U.S.C. § 2254(d) permits a federal court to issue the writ only if the state court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotes omitted)). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant

to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The petitioner argues that the AEDPA is unconstitutional because (1) the limitations in 28 U.S.C. § 2254(d)(1) violate the doctrine of separation of powers; (2) the limitations under 28 U.S.C. § 2254(d)(1) contravene the Supremacy Clause; (3) 28 U.S.C. § 2254(d)(1) requires the federal court to issue unconstitutional advisory opinions that may not be enforced; (4) the standard of review in 28 U.S.C. § 2254(d)(1) violates the Due Process Clause of the Fourteenth Amendment; and (5) the AEDPA violates Art. I, § 9, cl. 2 of the Constitution because it effectively suspends the writ of habeas corpus. The Court does not believe these arguments have merit.

Most of these arguments have been raised in other courts previously, but they have little judicial recognition and no acceptance by any court majority. Judge Kermit Lipez of the First Circuit expressed the view in a dissent from the denial of a petition for rehearing *en banc* that the review standard required by the AEDPA impermissibly restricts lower federal courts from discharging their duties to issue writs of habeas corpus by depriving judges of a body of precedential authority on which to rely when saying what the law is, thereby inhibiting the judicial power in violation of the separation of powers doctrine; and improperly interferes with the responsibility of federal judges to ensure the supremacy of federal law. *Evans v. Thompson*, 524 F.3d 1, 1-4 (1st Cir. 2008) (Lipez, J., dissenting). Judge Lipez acknowledged that his views were shaped by other judges who wrote on the subject; however, none of the writings represented a majority view of any court. *See, e.g.*, *Crater v. Galaza*, 508 F.3d 1261, 1261-70 (9th Cir. 2007) (Reinhardt, J., dissenting from

denial of rehearing *en banc*); *Irons v. Carey*, 505 F.3d 846, 854 (9th Cir. 2007) (Noonan, J., concurring); *Davis v. Straub*, 445 F.3d 908, 908-13 (6th Cir. 2006) (Martin, J., dissenting from denial of rehearing *en banc*); *Lindh v. Murphy*, 96 F.3d 856, 885 (7th Cir. 1996) (Ripple, J., dissenting).

Other federal circuits have considered the arguments the petitioner makes here and rejected them. For instance, in *Green v. French*, 143 F.3d 865, 874-75 (4th Cir. 1998), *abrogated on other grounds by Williams v. Taylor*, 529 U.S. 362 (2000), the Fourth Circuit held that the AEDPA's amendment to section 2254(d)(1) was merely a choice-of-law rule that "does not limit any inferior federal court's independent interpretive authority to determine the meaning of federal law in any Article III case or controversy." *Id.* at 874; *see also Duhaime v. Ducharme*, 200 F.3d 597, 601 (9th Cir. 2000).

The opinion of Judge Martin dissenting from the *en banc* denial in *Davis v. Straub* suggested that the Sixth Circuit read the "unreasonable application" clause as requiring a Supreme Court case "on all fours" with the case before the court before the writ could issue. That concern may be ill-founded. Section 2254(d)(1) allows the writ to issue if a conviction resulted from a decision by a state court that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In another context, the Supreme Court has stated: "Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Courts in this and other districts have had little trouble applying the AEDPA's review standard sensibly by extracting legal principles from Supreme Court jurisprudence unburdened by factual

constraints. *See, e.g., Seaman v. Washington*, No. 08-14038, 2010 WL 4386930 (E.D. Mich. Ocr. 29, 2010); *Cox v. Curtin*, 698 F. Supp. 2d 918 (W.D. Mich. 2010); *Goodell v. Williams*, 676 F. Supp. 2d 640 (N.D. Ohio 2009); *McBroom v. Warren*, 542 F. Supp. 2d 730 (E.D. Mich. 2008); *Wallace v. Bell*, 387 F. Supp. 2d 728 (E.D. Mich. 2005); *Ege v. Yukins*, 380 F. Supp. 2d 852 (E.D. Mich. 2005), *aff'd in part* 485 F.3d 364 (6th Cir. 2007); *Higgins v. Renico*, 362 F. Supp. 2d 904 (E.D. Mich. 2005), *aff'd* 470 F.3d 624 (6th Cir. 2006).

Counsel for the petitioner has raised all of the present arguments challenging section 2254(d) in other cases before this Court, and they all have been rejected. *See Byrd v. Trombley*, 580 F. Supp. 2d 542, 552 (E.D. Mich. 2008); *Fike v. Trombley*, No. 07-10868, 2010 WL 1286412, *3-6 (E.D. Mich. Mar. 31, 2010); *Robinson v. Davis*, No. 06-11324, 2009 WL 307507, *17-20 (E.D. Mich. Feb. 06, 2009). This Court adopts the holding expressed by the Court in *Byrd v. Trombley*, and based on the reasoning expressed therein concludes that the standard of review established by Congress in the AEDPA does not violate the separation of powers doctrine, the Supremacy Clause, or the Due Process Clause; the AEDPA does not require federal courts to issue advisory opinions on state courts decisions that violate the Constitution but not unreasonably so; and the AEDPA does not amount to a suspension of the writ.

In applying the applicable review standard set forth in the AEDPA, the Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court has "explained that an *unreasonable* application of federal law is different from an *incorrect* application of federal law. Indeed, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable. This distinction creates a substantially higher threshold for obtaining relief than *de novo* review. AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, --- U.S. ---, ---, 130 S. Ct. 1855, 1862 (2010) (finding that the state court's rapid declaration of a mistrial on grounds of jury deadlock was not unreasonable even where "the jury only deliberated for four hours, its notes were arguably ambiguous, the trial judge's initial question to the foreperson was imprecise, and the judge neither asked for elaboration of the foreperson's answers nor took any other measures to confirm the foreperson's prediction that a unanimous verdict would not be reached") (internal quotation marks and citations omitted); *see also Knowles v. Mirzayance*, --- U.S. ---, ---, 129 S. Ct. 1411, 1419 (2009) (noting that the Supreme "Court has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 123 (2008) (per curiam)); *Phillips v. Bradshaw*, 607 F.3d 199, 205 (6th Cir. 2010); *Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Eady v. Morgan*, 515 F.3d 587,

594-95 (6th Cir. 2008); *Davis v. Coyle*, 475 F.3d 761, 766-67 (6th Cir. 2007); *King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Rockwell v. Yukins*, 341 F.3d 507, 511 (6th Cir. 2003) (en banc).

Finally, the AEDPA amended the federal habeas statute to limit a prisoner to one petition filed in the district court; a second or successive petition may not be filed absent permission from the court of appeals. 28 U.S.C. § 2244. The present petition does not run afoul of that new rule, however, because the petitioner's first petition filed in 1981 was not adjudicated on the merits and was dismissed without prejudice. *See Slack v. McDaniel*, 529 U.S. 473, 485-86 (2000) (holding that "[a] habeas petition filed in the district court after an initial habeas petition was unadjudicated on its merits and dismissed for failure to exhaust state remedies is not a second or successive petition").

## A.

The petitioner first claims that the prosecutor failed to disclose timely the following six categories of critical exculpatory evidence: (1) evidence of Mary Kinsman's relationship with Roman Poronczuk and their drug use, including evidence that Mrs. Kinsman stole $20,000 from Leslie Kinsman and waited until James Ketelaar died before calling the police; (2) a statement by a neighbor of the victim that she observed a vehicle containing four individuals at the Kinsmans' residence on the night of the murder; (3) a police report indicating that Leslie Kinsman was cooperating with federal law enforcement, one of his associates was killed by a shotgun blast, Kinsman and a Mexican man were arrested on drug charges but Kinsman was let go, and Frank Parker was connected to Leslie Kinsman's drug business; (4) evidence that Victor Bossio was involved in Leslie Kinsman's drug business; (5) the transcripts from Scott Croydon's guilty plea and sentencing indicating his testimony in the petitioner's case was "paid for," and a seventeen-page statement made by Croydon that he fabricated his testimony against the petitioner; and (6) police

-18-

interview transcripts of Claude Johnson showing that Johnson believed he was shot because he was a "snitch" for implicating another man for an arson and not because he knew about the Dearborn murders.

The Due Process Clause requires the state to disclose to the defense favorable evidence that is material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). A prosecutor has a duty to learn of favorable evidence in the possession of others acting on the state's behalf, including the police. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Exculpatory evidence includes evidence that may be used to impeach the state's witnesses. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

Therefore, "[a] successful *Brady* claim requires a three-part showing: (1) that the evidence in question be favorable; (2) that the state suppressed the relevant evidence, either purposefully or inadvertently; (3) and that the state's actions resulted in prejudice." *Robinson v. Mills*, 592 F.3d 730, 735 (6th Cir. 2010) (quoting *Bell v. Bell*, 512 F.3d 223, 231 (6th Cir. 2008)); *see also In re Siggers*, 615 F.3d 477, 480 (6th Cir. 2010). The petitioner bears the burden of establishing each of these three elements. *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000).

In this case, the state trial court rejected the claim, finding that the petitioner failed to demonstrate that the items were actually suppressed by the prosecution. The trial court found that the petitioner had actual knowledge of the material. That finding enjoys a presumption of

correctness. "A federal court is to apply a presumption of correctness to state court findings of fact for habeas corpus purposes unless clear and convincing evidence is offered to rebut this presumption." *Treesh v. Bagley*, 612 F.3d 424, 430 n.1 (6th Cir. 2010) (quoting *James v. Brigano*, 470 F.3d 636, 643 (6th Cir. 2006), and 28 U.S.C. § 2254(e)(1)); *see also Goff v. Bagley*, 601 F.3d 445, 456 (6th Cir. 2010) ("We apply a presumption of correctness to state court findings of fact, and the petitioner may rebut this presumption only by clear and convincing evidence." (internal quotation marks omitted)). This presumption also applies to findings of fact rendered by state appellate courts. *Treesh*, 612 F.3d at 430 n.1 (citing *Sumner v. Mata*, 449 U.S. 539, 545-46 (1981)). A finding by a tate court that favorable evidence was not withheld is subject to the presumption of correctness. *See Matthews v. Ishee*, 486 F.3d 883, 895 (6th Cir. 2007); *Payne v. Bell*, 418 F.3d 644, 663-64 (6th Cir. 2005); *Armstrong v. Morgan*, 372 F.3d 778, 783 (6th Cir. 2004).

The petitioner asserts that he is entitled to an evidentiary hearing in this court to support his claims. "Under AEDPA, evidentiary hearings are not mandatory." *Johnson v. Mitchell*, 585 F.3d 923, 934 (6th Cir. 2009) (quoting *Vroman v. Brigano*, 346 F.3d 598, 606 (6th Cir. 2003)); *cf. Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate.") Under AEDPA, a habeas petitioner may introduce new evidence "only if [the petitioner] was not at fault in failing to develop that evidence in state court, or (if he was at fault) if the conditions prescribed in § 2254(e)(2) were met." *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004) (citing *Williams v. Taylor*, 529 U.S. 420, 431-37 (2000)); *see also Garner v. Mitchell*, 502 F.3d 394, 405-06 (6th Cir. 2007), *rev'd on other grounds*, 557 F.3d 257 (6th Cir. 2009). Section 2254(e)(2) defines "fault" as occurring where the petitioner "has failed

to develop the factual basis of a claim in State court proceedings." The Supreme Court has explained that "a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*, 529 U.S. at 432; *see also Ivory v. Jackson*, 509 F.3d 284, 297-98 (6th Cir. 2007). "Diligence" requires "a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Williams*, 529 U.S. at 435.

The petitioner has supported his claim in state court with documents that flesh out the contents of the allegedly suppressed evidence, but he did not provide the state courts with any evidence to establish that the documents were not turned over to the petitioner at the time of his trial. The petitioner did not furnish the affidavits of the trial prosecutor or defense counsel, both of whom appear to be available even today, and his attorney in fact discussed at the December 2, 2005 hearing that such affidavits might be useful. He has made no other evidentiary proffer supporting the claim that the trial court's finding that the evidence was not suppressed was incorrect.

If a habeas petitioner's claims can be resolved on the existing record, a federal evidentiary hearing is unnecessary. *Schriro*, 550 U.S. at 474. Conclusory allegations not supported by specific facts are insufficient to establish entitlement to an evidentiary hearing. *Washington v. Renico*, 455 F.3d 722, 733 (6th Cir. 2006). No such support exists here. Because a careful examination of the existing trial record supports the state trial court's conclusion that the petitioner's trial counsel possessed the information in question, and because the petitioner offers nothing to the contrary, the *Brady* claim will be resolved based on the existing record.

1.

The petitioner first alleges that police reports discovered as a result of a 2002 Freedom of Information Act (FOIA) request contain information suggesting that Mary Kinsman and Roman Poronzcuk were responsible for the murders. The reports describe statements from informants who alleged that the two were involved in a romantic relationship, they used drugs together, Mary Kinsman had stolen $20,000 from Leslie Kinsman, and Mary Kinsman waited for James Ketelaar to die before calling the police.

The state court's finding that defense counsel had this information is supported by the fact that these police reports also contain additional information that was used by defense counsel at trial, suggesting that the reports were not suppressed. One of the police reports alleged not to have been disclosed contains a statement from an informant that Leslie Kinsman was buying a pound of heroin from a Mexican on Vernor Highway, they were both arrested, and Kinsman was let go. This same report contains the information from an informant that Frank Parker was involved with Kinsman in narcotics trafficking. *See* Br. in Supp. of Pet., Ex. A; Ex. B at 16-17.

Defense counsel apparently was aware of the information regarding the drug deal with the Mexican and the relationship with one Frank Parker. Both facts were discussed multiple times at trial. *See* Tr., Oct. 11, 1977, at 90-91; Tr. Oct. 12, 1977 at 93, 111, 136-144; Tr., Oct. 13, 1977, at 10; Tr., Oct. 14, 1977, at 43-48; State's Br. on Appeal to Mich. Ct. App., Feb. 27, 2006, at 26-27 (citing Tr., Oct. 11, 1977, at 87, 90-91; Tr., Oct. 12, 1977, at 3, 20, 38, 88, 103, 105; Tr., Oct. 17, 1977, at 17, 39). Defense counsel also cross-examined both Mary Kinsman and Roman Poronczuk about their drug use. *See* Tr., Oct. 12, 1977, at 75-76; Tr., Oct. 14, 1977 at 51; State's Br. on Appeal to Mich. Ct. App., Feb. 27, 2006, at 26 (citing Tr., Oct. 12, 1977, at 75-76; Tr., Oct. 14, 1977, at 51, Tr., Oct. 17, 1977, at 22). The trial record suggests that defense counsel had possession of the police

report that contained these allegations. Defense counsel's failure to elicit at trial evidence about the stolen $20,000 or Mary waiting for one of the victims to die does not show that the police report was suppressed, when the source of that information was a document that furnished other evidence the petitioner's lawyer used. Moreover, it is not clear how the additional information would have helped the petitioner at trial, since it was not presented in a form that was admissible; and the allegations came from an unattributed statement made to an FBI agent that was then forwarded to the local police.

The trial court's finding that the petitioner possessed these police reports at the time of trial is supported by the record, and the petitioner has not presented clear and convincing evidence to upset this factual finding.

2.

The petitioner points to a police report by a Detective Henry, who apparently conducted a neighborhood canvass, which contains a statement by a resident, Celia Rubay, who claimed to have seen a vehicle occupied by four individuals attempt to park in front of the witness' house on the night in question and then drive away. According to the report, the occupants of the vehicle did not even exit it, which casts doubt on the exculpatory value of the statement. Moreover, the trial record suggests that defense counsel had received the original neighborhood canvass report that contained the same statement. *See* Tr., Oct. 13, 1977, at 19-25. There was some discussion at trial whether the last page of the report was missing, and the petitioner argues that the missing page contained the critical information. However, at trial Officer Howarth, referring to his report, actually named Ms. Rubay as one of the individuals he interviewed during the canvass. *Id.* at 23. The information is

-23-

not conclusive, but it furnishes adequate support for the trial court's conclusion that the evidence was not suppressed.

3.

The petitioner also contends that he was not given a police report containing information that Leslie Kinsman was cooperating with federal law enforcement, one of Kinsman's associates was killed by a shotgun blast, Kinsman and a Mexican man were arrested during a drug transaction, Kinsman was released after the arrest, and Frank Parker was connected to Kinsman's drug business. The petitioner argues that this information was exculpatory because it suggested that Kinsman may have been killed as a result of his cooperation with the authorities.

Kinsman's association with the unnamed Mexican drug-dealer and his association with Frank Parker were explored by defense counsel at trial. Tr., Oct. 11, 1977, at 90-91; Tr., Oct. 12, 1977, at 93, 111, 136-144; Tr., Oct. 13, 1977 at 10; Tr., Oct. 14, 1977, at 43-48; State's Br. on Appeal to Mich. Ct. App., Feb. 27, 2006, at 26-27 (citing Tr., Oct. 11, 1977, at 87, 90-91; Tr., Oct. 12, 1977, at 3, 20, 38, 88, 103, 105; Tr., Oct. 17, 1977, at 17, 39). The trial record therefore supports that state court's conclusion that the petitioner was aware of this information and it was not suppressed.

4.

The petitioner's argument that information was concealed about Victor Bossio's knowledge of Kinsman's drug business is based once again on the multi-page police report the petitioner's wife obtained through her FOIA request. As noted earlier, that same report contains information about Kinsman's arrest with the Mexican drug dealer, which defense counsel used during his cross-examination at trial. The petitioner suggests that Bossio's knowledge implies his participation in the drug business, which in turn supports the theory that Kinsman and Bossio were killed as a result

of their drug dealing. Perhaps. The exculpatory value of that information is marginal, but that defect was not addressed by the state court. The Court concludes, however, that because the report was a source of information that the petitioner's attorney used at trial, the state court's conclusion that the evidence was not suppressed by the state must be presumed correct.

5.

The petitioner next contends that the guilty plea and sentencing transcripts from the Macomb County prosecution of Scott Croydon were suppressed by the prosecutor. He also argues that a the prosecutor suppressed seventeen-page statement made by Croydon concerning the petitioner's shooting of Claude Johnson and the petitioner's murder of Theresa Martelle.

Croydon pled guilty to armed robbery in the Macomb County, Michigan circuit court on June 21, 1977, and he was sentenced on July 20, 1977. There is no evidence that the Wayne County prosecutor actually had these transcripts in his possession, and the transcripts were public records that the petitioner could have obtained from sources other than the prosecutor. Addressing the same issue, the Sixth Circuit has explained that "because they are records of public court proceedings, transcripts of [a government witness's] trial testimony, plea hearing, and sentencing hearing were available to [the defendant] from sources other than the prosecution. *Brady* does not apply to materials that are not 'wholly within the control of the prosecution.'" *United States v. Delgado*, 350 F.3d 520, 527 (6th Cir. 2003) (quoting *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998)). The prosecutor had no obligation in this case to obtain the transcripts and provide copies to the petitioner.

Moreover, there is no evidence in the present record that Croydon was given any inducement to testify against the petitioner in the Wayne County prosecution. The petitioner certainly knew that

Croydon had pleaded guilty in Macomb County for his participation in the attack on Claude Johnson and the murder of Theresa Martelle because Croydon testified against the petitioner in his Macomb County trial in exchange for concessions in a plea bargain in that county. At the petitioner's preliminary examination at the Wayne County case, Croydon testified that he had never spoken to the assistant prosecutor handling the Wayne County case and there were no deals offered in exchange for Croydon's testimony in Wayne County. Tr. of Prelim. Exam. Hr'g, May 6, 1977 at 118, 120-26. During Croydon's plea hearing in Macomb County, the prosecutor stated that Croydon "voluntarily testified in Wayne County on behalf of the People there." State's Br. on Appeal to Mich. Ct. App., Feb. 27, 2006, at 21-22 & Ex. B, Tr. of Plea Hr'g, June 21, 1977, at 3. The petitioner points to nothing in the plea or sentencing transcript that establishes that Croydon also agreed to testify against the petitioner in Wayne County as part of any plea agreement.

Nor was Croydon's statement to police suppressed. In response to the petitioner's motion for relief from judgment, the Wayne County prosecutor asserted that the statement was used by defense counsel in cross-examining Croydon during the petitioner's Macomb County trial. The prosecutor cited specific pages in the record of the Macomb County trial in support of the allegation. It appears that the prosecutor attached the transcript pages in an appendix to its state court pleadings, but the appendix was not included in the Rule 5 material filed in the present case. The petitioner did not dispute in state court — and does not contest here — the allegation that he used Croydon's statement in his Macomb County trial. If the petitioner used this actual evidence in another court proceeding, it is difficult to see how he can contradict the state court's finding that the evidence was not suppressed in the Wayne County case.

Nor is the exculpatory value of Croydon's statement as strong as the petitioner contends. The statement did not necessarily suggest a recent fabrication of Croydon's testimony against the petitioner. It is true that Croydon mentioned money as *part* of the motivation for going after Johnson, and unlike his preliminary examination testimony, the statement does not claim that the petitioner told him about the Dearborn murders. But Croydon also told police in the statement that the petitioner was going to kill Johnson "because Johnson had a lot against him that could send him back to prison." Br. in Supp. of Pet., Ex. G at 3. Croydon's statement to police did not assert that money was the petitioner's only motivation for attempting to kill Johnson.

6.

The petitioner also alleges that the prosecutor withheld police interview transcripts of Claude Johnson showing that Johnson believed he was shot because he was a "snitch" for implicating another man for an arson and not because he knew about the Dearborn murders. The petitioner has not shown that these transcripts were suppressed. The interview was conducted in relation to the petitioner's Macomb County prosecution for assaulting Johnson and murdering Martelle. According to the Wayne County prosecutor's response to the motion for relief from judgment, the officers who conducted the interview all testified at the petitioner's Macomb County trial. The petitioner did not dispute that allegation in state court. Moreover, during the petitioner's Wayne County trial, Johnson testified regarding the allegation that the petitioner accused him of being a "snitch." Tr., Oct. 20, 1977, at 64. Brenda Burgess also testified regarding these allegation for the defense. State's Br. on Appeal to Mich. Ct. App., Feb. 27, 2006, at 29 (citing Tr., Oct. 20, 1977, at 15-18, 25-26, 46-52, 55-56, 64-65, 76, 80; Tr., Oct. 24, 1977, at 55, 61, 109; Tr., Oct. 25, 1977, at 9-11, 19, 443-44; Tr., Oct.

31, 1977, at 61). The petitioner has not furnished clear and convincing evidence that the state trial court's determination that the petitioner possessed this evidence was incorrect.

The Court concludes, therefore, that the petitioner is not entitled to relief on his claim that favorable evidence was supressed by the state in violation of *Brady v. Maryland*.

B.

The petitioner next argues that he was deprived of the effective assistance of trial counsel because his state trial attorney failed (1) to elicit evidence from Brenda Burgess at trial that the petitioner was with her and another couple at the time of the murders; (2) to discover and present evidence regarding Mary Kinsman and Roman Poronczuk's motive to commit the murders or better support the theory that the murders were a result of Kinsman's drug dealing; and (3) to more thoroughly cross-examine Croydon during the preliminary examination.

The two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs claims of ineffective assistance of counsel. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). To show a violation of the Sixth Amendment right to effective assistance of counsel, a petitioner must establish that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. Counsel's performance is deficient if the attorney's representation "fell below an objective standard of reasonableness." *Id.* at 688. The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. However, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. The Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under

prevailing professional norms." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 689 (internal quotes omitted)). Counsel's conduct is entitled to the strong presumption that it falls within the wide range of reasonable professional assistance, and the petitioner must overcome the presumption that the conduct "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Higgins v. Renico*, 470 F.3d 624, 632 (6th Cir. 2006) (observing that "[s]uch [strategic] choices can vary greatly from attorney to attorney and from case to case, and reviewing courts must scrutinize these choices with a great deal of deference").

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. A court making this determination must consider the totality of the evidence before the factfinder. *Id.* at 695. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696. Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

1.

The petitioner contends that his trial lawyer did not elicit from Brenda Burgess evidence that would have established an alibi for the Dearborn murders. Brenda Burgess (now known as Brenda Clavenna) testified at trial; she just did not mention anything about the alibi.

Brenda Burgess signed an affidavit on April 2, 2003 that describes in some detail events occurring almost thirty years before on April 12 and 13, 1974. She remembers being with the petitioner and meeting another couple at a bar from 9:00 p.m. until 2:30 a.m. on the night of the murders. The murders occurred sometime shortly after 9:00 p.m. She recalls learning about the murders the following day when she saw a news report on television. She states in the affidavit that she remembers the events of April 12, 2003 so well after the passage of so much time because Mrs. Kinsman was a friend of theirs.

Brenda Burgess explains in the 2003 affidavit that she actually told the petitioner's trial counsel that her then-husband was with her on the night of the murders and gave him the names of the other couple with whom the Burgesses were dancing and drinking. She says that trial counsel asked her to contact the other couple, and when she did they refused to get involved. She avers that defense counsel actually tried to interrogate her at trial about the alibi, "but the Prosecutor objected when Arthur's attorney asked me where Arthur and I were on the evening of April 12, 1974, and the Judge accepted his objections." Pet., Ex. D ¶ 12. The Court has not been able to locate that exchange in the trial record available. However, during Brenda Burgess's testimony, she mentioned that she and her husband "had been out dancing the night before," whereupon the prosecutor asked for a bench conference, which was not recorded, and the testimony thereafter turned to a different subject. Tr., Oct. 20, 1977, at 69.

Exculpatory affidavits made years after the events are "treated with a fair degree of skepticism," especially when there is "no reasonable explanation for the . . . delay. *Herrera v. Collins*, 506 U.S. 390, 423 (1993) ("It seems that, when a prisoner's life is at stake, he often can find someone new to vouch for him. Experience has shown, however, that such affidavits are to be treated with a fair degree of skepticism. These affidavits are no exception. They are suspect, produced as they were at the 11th hour with no reasonable explanation for the nearly decade-long delay."). There is good reason for incredulity in such circumstances. The first question that comes to mind is why the witness did not disgorge the information earlier when it could have made a difference. *See McCray v. Vasbinder*, 499 F.3d 568, 573-74 (6th Cir. 2007) ("Not only did [the affiants], as family members, have a personal stake in exonerating [the petitioner], *see Bosley v. Cain*, 409 F.3d 657, 665 (5th Cir. 2005), but they . . . have not provided a good explanation for why they took so long to come forward with evidence that their relation stands wrongly accused of murder."). In cases involving alibis, many times the answer is that the witness was unaware his or her testimony was important due to a lack of investigation or diligence by defense counsel. That is not the case here. The petitioner presumably knew he had an alibi, and Brenda Burgess actually testified at trial. She described her relationship with the petitioner and their residential arrangements. She discussed the petitioner's motorcycle accident, which she says in her affidavit occurred the day after the murders. Remarkably, however, she apparently never testified at trial that the petitioner was with her at the time the murders were committed, even though earlier she told trial counsel about the alibi. She explains that she tried to mention that fact, but she was cut off.

To that extent, Brenda Burgess's affidavit is somewhat at odds with her trial testimony. The jurisprudence is replete with cautionary tales against the use of recanting affidavits. *See, e.g., United*

*States v. Willis*, 257 F.3d 636, 645-46 (6th Cir. 2001) ("[A]ffidavits by witnesses recanting their trial testimony are to be looked upon with extreme suspicion.") (internal citations and quotation marks omitted); *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991), *superseded in part on other grounds by* U.S.S.G. § 2D1.5(a) ("Recanting affidavits and witnesses are viewed with extreme suspicion."). Brenda Burgess's affidavit does not exactly recant here trial testimony, but her silence at trial on the alibi evokes the same level of suspicion as if it did.

The petitioner asks the Court to accept the contention that trial counsel refused to pursue an alibi defense, even though he was made aware of it in advance and called as a witness and questioned the person who could provide the information, based solely on Brenda Burgess's affidavit. The Court is not inclined to do so for the reasons stated above. There are other reasons to doubt the credibility of the affiant as well. For instance, the affidavit contains details, including specific dates and times, about an event date that occurred thirty years prior. The affiant explains that the details were memorable because they occurred the day before she heard that her friend's husband was murdered. Perhaps. But that does not explain how the affiant can recall with precision the events and exact times that conveniently establish the alibi. It is of course not surprising that Brenda Burgess would remember being a witness at her ex-husband's 1977 murder trial. But it strains credulity to believe that in 2003 Mrs. Burgess remembers arriving at a particular bar at 9:00 p.m. on April 12, 1974.

The failure to raise an alibi defense also appears to be a new development in the petitioner's quest for exoneration. He did not raise the issue of trial counsel's failure to raise the alibi defense in his direct appeal. Presumably, the petitioner would attribute that oversight to appellate counsel's ineffectiveness. However, the petitioner filed a "Layman's Pleading" in the court of appeals

complaining that appellate counsel did not raise all the issues he wanted presented. He then recites a litany of errors in his trial, but he never mentioned the failure to pursue the alibi. *See* Pet., Ex. H. Nor is there any mention of trial counsel's refusal or failure to pursue the alibi defense in the petitioner's 1981 petition for habeas corpus filed in this court, in which he raised an ineffective assistance of trial counsel claim.

There may be other explanations for omitting an alibi defense in the case. It appears that defense counsel considered the option, since the record contains an order adjourning the trial to permit defense counsel to file an alibi notice. Perhaps that defense was rejected because Brenda Burgess could not actually place her husband in the bar at a time before the murders were committed. After all, the police arrived at the scene at 10:30 p.m., and there apparently was considerable delay in reporting the crimes. Establishing the exact time of the shootings may have been problematic, and since the crimes were unsolved for three years, Brenda Burgess would have had to reconstruct the evening long after the fact. It is conceivable that an alibi defense was rejected for strategic reasons, and Brenda Burgess's affidavit does not address those points. Trial counsel might shed some light on his decision-making process, but neither side has attempted to procure his affidavit, either in state court or for the present record.

Brenda Burgess's affidavit does not provide strong evidence that a legitimate alibi defense was not pursued properly by trial counsel. The claim of ineffective assistance of counsel cannot prevail because the petitioner has not demonstrated deficient performance by his trial attorney.

2.

The petitioner also contends that his state trial counsel was ineffective for failing to conduct a pretrial investigation properly. He says trial counsel should have discovered and used the police

report suggesting a motivation for Mary Kinsman and Roman Poronczuk to have committed the crimes; he reasons that with that report, he could have supported the theory that the murders were a result of Kinsman's drug dealing.  As stated above, the petitioner has not overcome the state trial court's finding that the petitioner had the police report in question.  Defense counsel cross-examined Mary Kinsman on the subject of Leslie Kinsman becoming paranoid due to a shipment of heroin he had received from a Mexican man.  Tr., Oct. 11, 1977, at 90-91.  Mary Kinsman testified that just a short time before his death Leslie had taken extra safety precautions associated with his drug business including having a "peep" hole installed in the door of the upstairs of the residence.  *Id.* at 92.  Defense counsel attempted to cross-examine a police officer about the same allegation.  Tr., Oct. 13, 1977, at 10-11.  Defense counsel also attempted to cast suspicion on Roman Poronczuk who admitted that he took some heroin when he arrived at the house on the night of the murders.  Defense counsel did present the defense that the victims were killed as a result of their narcotics dealing and not by the petitioner.

The petitioner does not allege with specificity how the information could have been used more effectively.  The fact that defense counsel attempted to shift blame to unnamed persons involved in narcotic trafficking with Leslie Kinsman instead of Mary Kinsman and Roman Poronczuk who were present to defend the accusation was a matter of reasonable trial strategy.  The petitioner has not overcome the presumption that counsel performed effectively in his investigation and presentation of the defense theory.

### 3.

The petitioner next contends that trial counsel was ineffective because he was given insufficient time to prepare for the preliminary examination, and as a result, he was not able to cross-

examine Scott Croydon effectively. The petitioner does not attempt to establish actual prejudice flowing from defense counsel's performance at the preliminary hearing. Instead he argues that the inadequate preparation time constituted a constructive absence of counsel at a critical phase, eliminating the need to establish actual prejudice under *United States v. Cronic*, 466 U.S. 648 (1984). In *Cronic*, the Supreme Court established a new rule that dispensed with the prejudice component of the ineffective assistance of counsel test and replaced it with a *per se* rule for circumstances not only when counsel was absent, but also when counsel fails to function in any meaningful sense as the state's adversary. *Id.* at 659-60.

The Court finds flaws in both the legal and factual premises of the argument. As for the legal premise, the petitioner stakes his claim entirely on *Cronic*, which was decided after the petitioner's conviction became final in 1980, that is, after the end if his direct appeal. "In *Teague v. Lane*, 489 U.S. 288 (1989), and subsequent cases, the Supreme Court explained the framework for determining when rules apply retroactively to final criminal judgments. Under *Teague*, an old rule applies both on direct and collateral review, but a new rule is generally applicable only to cases still on direct review." *Duncan v. United States*, 552 F.3d 442, 444 (6th Cir. 2009) (footnote omitted).

*Cronic* announced a new rule. A case announces a new rule when "it breaks new ground or imposes a new obligation on the States or the Federal Government," or it "was not dictated by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301. Before *Cronic*, a defendant alleging ineffective assistance of counsel was required to show prejudice. *See United States v. Morrison*, 449 U.S. 361, 364, 365 (1981) (stating that "[c]ases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe

on competing interests," and that "certain violations of the right to counsel may be disregarded as harmless error").  The exception to the prejudice requirement before *Cronic* involved only those cases where there was a wholesale denial of counsel, *see White v. Maryland*, 373 U.S. 59, 60 (1963) (per curiam), or when counsel was laboring under an actual conflict of interest, *see Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980).  *Cronic* added another dimension.  The Court stated that "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Cronic*, 466 U.S. at 659.  Such cases are unusual.  But the Court observed,

> Circumstances of that magnitude may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.

*Id.* at 659-60.

Since *Cronic* announced a new rule after the petitioner's conviction became final, it applies here only if the new rule "places a class of private conduct beyond the power of the State to proscribe," or the rule is a "'watershed rule[] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Lambrix v. Singletary*, 520 U.S. 518, 539 (1997). Neither of these exceptions applies here.

Moreover, defense counsel's performance at the preliminary examination would not fall within *Cronic*'s rubric even if that case did apply.  The petitioner argues that his attorney was appointed only a few days before the hearing and did not have much time to prepare.  He says that his lawyer should have obtained the transcripts of Croydon's plea and testimony from the Macomb County case to use in cross-examining Croydon at the preliminary hearing, which he was prevented

from doing because of the short notice of the assignment. The record shows that defense counsel accepted the assignment, visited his client in jail, and represented him at the preliminary examination, which is a probable cause hearing. The petitioner points out that defense counsel's performance may have been better with more preparation time. However, that is a far cry from a lawyer who "fails to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 659.

Because *Cronic* does not apply as a matter of fact or law, the petitioner must show that trial counsel's deficient performance at the preliminary examination caused him prejudice, which he has neither argued nor shown. He is not entitled to habeas relief on this ground.

## C.

Finally, the petitioner argues that his appellate counsel was ineffective for failing to raise the *Brady* and ineffective assistance of trial counsel claims during the petitioner's direct appeal.

The Supreme Court has held that a criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. *Jones v. Barnes*, 463 U.S. 745 (1983). The Court explained:

> For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the . . . goal of vigorous and effective advocacy. . . . Nothing in the Constitution or our interpretation of that document requires such a standard.

*Id.* at 754. Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).

In this case, appellate counsel filed a comprehensive brief in the Michigan Court of Appeals, and the petitioner supplemented the issues with a filing of his own. Neither of these filings included

an argument that the prosecutor withheld exculpatory information from the defense, but it is not clear how that argument could have been made on direct appeal, since according to the petitioner the information did not come to light until the FOIA results were obtained decades later. The Court has found that neither the *Brady* nor the ineffective assistance of counsel claims has merit. "Counsel could not be []constitutionally ineffective for failing to raise these meritless arguments." *Mapes v. Coyle*, 171 F.3d 408, 427 (6th Cir. 1999).

III.

The state court decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. The petitioner has not established that he is in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus [dkt # 1] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: November 17, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 17, 2010.

s/Deborah R. Tofil
DEBORAH R. TOFIL